## JIM NURSE v. THE STATE.

### No. 625.  Decided May 18, 1910.

**Swindling—Insufficiency of Evidence—Spiritualism.**

Where, upon trial of swindling consisting of false representations by defendant as a spiritualist, upon the ground that he could find buried treasure by communication with the spirits and by which he obtained the sum of $20 from the party injured, the evidence showed that the defendant did find money as he said he could, which he afterwards fraudulently appropriated the conviction could not be sustained, as the injured party was neither deceived nor misled by the alleged misrepresentation.

Appeal from the County Court of Bexar.  Tried below before the Hon. P. H. Shook.

Appeal from a conviction of swindling; penalty, a fine of $500 and one day in the county jail.

The opinion states the case.

*T. H. Ridgeway,* for appellant.—Cited Curtis v. State, 88 S. W. Rep., 236; Buckalew v. State, 11 Texas Crim. App., 352; Allen v. State, 16 Texas Crim. App., 150; Doxey v. State, 47 Texas Crim. Rep., 503, 84 S. W. Rep., 1061.

*John A. Mobley,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of swindling. The false representations and deceitful pretenses are that he represented to one Alexander that he, appellant, was a spiritualist, and worked with spirits, and that the spirits had told him that there was a large sum of money buried on the property of said Alexander, and that if he, Alexander, would give to him, appellant, $20, he would find a large sum of money and give it to Alexander, and that by this means he obtained the sum of $20 in exchange for the services rendered and to be rendered in discovering the place where the large sum of money was buried; and that by reason of these false pretenses Alexander was induced to part and did part with the title and possession of the $20, and delivered same to appellant in exchange for services in finding the place where the said sum of money was buried. These pretenses and statements are negatived by allegations that appellant did not have any communication with any spirit or spirits, and did not then and there find any sum of money buried, and said pretenses and representations so made and devices so used by appellant to Alexander were false and fraudulent, and that appellant knew the same to be false and fraudulent when he made those statements. Alexander testified that about a year before the trial his house settled and he procured the services of Will Mabry to dig down on one side and put in a new foundation. "After that one of our doors kept rapping—rapping every day and night—and made such a peculiar noise that we became suspicious. My wife and I would see lights around the place where they had dug to fix the foundation. I have always heard that where you would see lights at night there was money buried. Some time about the first of August, Will Mabry dug down in this hole and found a cedar block buried several feet down in the ground. He then dug again and found a concrete block, and Will came to me and said that he believed money was buried there. My wife kept seeing lights and hearing the door rapping, and she believed that money was buried there, too. I did not much believe that there was any money buried there, but I just wanted to see whether there was or not. A few days after Will Mabry found the cedar block and the concrete block, I was talking to Jim Nurse, and he told me that there was money buried in my yard and that he would find it for me for $20. I told him then that after he finished his job and found the money that I would give him $20. He then sat down and wrote something on a paper which stated that he was to do the digging and find the

money and that after it was found that I was to pay him $20. He gave me this paper which he signed. I gave this paper to the constable at the time I had Jim arrested. I have not seen it since. Jim went to work, digging in the hole, and I went there that evening and they told me that they had taken out of the hole $42. I saw this money and I know that it was taken out of the hole because my wife and Will Mabry were there and said they helped him take it out. When I saw the money that they had taken out of the hole I was convinced that there was money there. Jim placed the $42 in a can and gave it to my wife and they buried it in the yard. I thought that Jim was all right then and I gave him the $10. They came that night and dug some more. I was there and my wife was there and Will Mabry was there. They took out some more money out of the hole, which was gold coins. I heard it rattle, and know that it was money. Will Mabry was helping him and picked up some of the money out of the bucket and showed it to me, and I know that it was money. My wife and Will Mabry were both standing there and Will Mabry was helping him. They then sprinkled some dirt over the money, which was in a bucket, and buried it by the door step. They would not let me handle the money. Jim said that there was some more money in the hole, and if we handled the money that the spirits would vanish it all. They put some dirt over the money then and after they buried it Jim said that he needed some money for his wife, that she was sick, and he had to get some medicine for her. I then let him have $10 more. Jim did not come back and dig any more. He came back and stole the $42 that was buried in the yard, that he first found in the hole, and also stole the money that was in the can and buried by the door step. Afterwards I dug up the can that was buried by the door step and it had a lot of iron washers in it which looked like they came off of railroad irons. There was no money in the can." On cross-examination the witness went over many of these matters, and he says Will Mabry said there was money buried there; that he raised Will Mabry, and that he had lived with him all his life, and was at the time of the trial living with him, and was living with him at the time he let appellant have the $20, and that he was then present in the courthouse during the trial as a witness, as was his wife. That after Will Mabry found the cedar block and the concrete block in the hole, he said there was money buried there, and witness' wife insisted there was money buried there. He further testified that he had heard appellant could find money when it was buried, and he wanted to see whether there was any money buried there or not; that he did not believe much there was, but always heard where you could see lights on the ground there was money buried there. That he let appellant have the first $10 after he had dug up the $42, and let him have the money willingly. That he thought then that he was all right, and he let him have the other $10 about twenty-

four hours after he let him have the first $10. That appellant did the digging, and he dug down nearly as deep as witness' head. That appellant told him that there was money buried there, and Mabry also told him there was money there. The witness says he knew there was money there, because appellant dug up $42 and gave it to his wife, and that he, appellant, also dug up a bucket of money at night. He says: "I know that it was money and I know he dug it out because I stood there and watched him do it. You could hear the money rattling fifty feet away. Will Mabry and my wife were both standing there, and Will Mabry helped him take the money out of the hole. Will Mabry picked the money up and looked at it and showed it to me and rattled it." Witness says he knew it was money because he saw it, and knew appellant dug it out of the hole, because he was standing there and watched him do it, and Mabry helped him take it out of the hole. He says: "I am not complaining because he got my $20, but I am complaining because he came back there and stole the money after he found it in the hole. If he will bring up that bucket of money that was dug out of the hole I will dismiss this case. I will take chances on it being money. Jim Nurse did not deceive me or misrepresent anything to me about money being buried in my yard because the money was there, and he dug it up and had it buried in the yard so that he could come back that night and steal it." This is the only witness introduced by the State, and it is upon this testimony the State relied for the conviction.

We are of opinion that the evidence does not support the conviction. If appellant made the representations that he was a spiritualist and could talk with spirits, this matter raised the question about which this court does not feel called upon to discuss or decide. The question of spiritualism and talking with spirits is a matter about which there is no evidence. We read much and hear more about the question of spiritualism and what it means, and about which the world may be more or less credulous or incredulous, and there is something in the New Testament to the effect that spirits shall be tried as to whether they were false or true. Glendower, in one of Shakespeare's plays, said, "I can call up spirits from the vastie deepe." Harry Hotspur replied, "Why, so can I, or so can any man, but will they come when you doe call for them?" There is no evidence in regard to the matter, one way or the other, that is, as to whether or not appellant conversed with the spirits or called them up and tested their veracity, but the fact is uncontroverted, whether he talked with the spirits or not, that he found the money as he promised. The alleged swindled party testified that he saw him dig up the money. Forty-two dollars was found at one time; the amount found on the second night is not stated. Whether appellant talked to the spirits or not, whether they disclosed to him the whereabouts of the buried treasure, under the State's evidence the treasure was there and found. It seems that appellant was prose-

cuted by the State's witness because of the fact that he came subsequently and took the money—committed theft under the witness' theory of the matter. He found the money as he said he could, and the record is silent as to whether the discovery of the money was through his communication with the spirits or not. Alexander was neither deceived nor misled. In this attitude of the record we are of opinion the State has failed to make a case.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*